IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**ROBERT RAYMOND REAN**,                    Civil Case No. 08-1403-KI

                Plaintiff,

                                            OPINION AND ORDER

        vs.

**CITY OF PORTLAND,** et al.,

                Defendants.


        Robert Raymond Rean, REG# 70571-065
        Victorville
        U.S. Penitentiary
        Inmate Mail/Parcels
        P.O. BOX 5300
        Adelanto, California  92301

                Pro Se Plaintiff


Page 1 - OPINION AND ORDER

J. Scott Moede
City Attorney's Office
1221 S.W. Fourth Avenue, Room 430
Portland , Oregon  97204

      Attorney for Defendants City of Portland, Portland Police Bureau
              Santos, Gore and Taylor

Agnes Sowle
County Attorney for Multnomah County, Oregon
Carlo Calandriello
Assistant County Attorney
501 SE Hawthorne Blvd., Suite 500
Portland, Oregon  97214

      Attorneys for Defendants Multnomah County, Jerri Jarmer and Carl Green

KING, Judge:

Robert Raymond Rean, a *pro se* plaintiff, alleges defendants violated his constitutional rights.  Defendants Multnomah County, Jerri Jarmer and Carl Green (hereinafter, "County defendants")[1] have filed a Motion for Summary Judgment (#33).  Defendants City of Portland, Portland Police Bureau, Santos, Gore and Taylor (hereinafter, "City defendants")[2] have also filed a Motion for Summary Judgment (#25).  Rean has filed several motions to strike the affidavits submitted in support of the City's motion (## 48, 49, 50, 51, and 52).  Rean has also filed what is

---

[1]Plaintiff also names the Multnomah County Department of Community Justice and the Multnomah County Sheriff's Office.  Both are agencies of Multnomah County and are not proper defendants.

[2]I previously dismissed Portland Police Officers Doug Halpin, T.A. Gradwahl, and Mitch Hergert, as well as former Multnomah County Sheriff Bernie Guisto, because plaintiff's First Amended Complaint failed to assert that these individuals were involved in the alleged constitutional violations.

Page 2 - OPINION AND ORDER

captioned Motion for Extension of Time to File a Response/Reply to Motion for Summary Judgment (# 59) in which he seeks relief under Federal Rule of Civil Procedure ("FRCP") 56(f). For the reasons stated below, I dismiss Rean's Amended Complaint and enter judgment in favor of the City and County defendants. I deny Rean's motions to strike affidavits and deny his motion for discovery under FRCP 56(f).

## BACKGROUND[3]

I.    Factual Background

A joint federal and state investigation of two planned home invasion robberies in Oregon and Washington ended with Rean's arrest, along with three other men, on the evening of June 15 and the early morning hours of June 16, 2007. Rean's arrest, charge, and conviction for violating his post-prison supervision conditions form the basis of Rean's complaint.

Rean's 36-month term of post-prison supervision was imposed after his conviction on April 30, 2003, for manufacturing a controlled substance. His conditions of supervision included the requirement that he obey all municipal, county, state and federal laws, that he refrain from possessing "weapons, firearms, or dangerous animals," and that he avoid associating with known gang members. Green Decl. Ex B.

While Rean was still on active post-prison supervision, under defendant Carl Green, the Portland Police Bureau caught wind of two planned home invasion robberies to occur in Portland, Oregon and Vancouver, Washington.

---

[3]Plaintiff neglected to respond to Multnomah County's Motion for Summary Judgment or its Concise Statement of Material Facts, despite the Court's extension of the response deadline. Accordingly, plaintiff is deemed to have admitted the facts in Multnomah County's Concise Statement of Material Facts. Local Rule 56(f).

Since plaintiff disputes many of the facts presented by the City defendants, I report the events as they were recorded by the Portland police officers in their reports.

On June 7, 2007, Damen T. White, an African-American male, informed a Portland police officer that he had been contacted by Raymond Mosley, another African-American male, about committing two robberies, one in Vancouver, Washington and one in Portland, Oregon.

On June 8, a Portland police officer pulled Mosley over during a traffic stop and confirmed his identity. Officers continued surveillance of Mosley and saw him meet White in Portland and drive to Vancouver, Washington where the two men met a third man called "Doc," later identified as Utomi O Odum. White later told an officer that Odum and Mosley went inside the Vancouver home–where Mosley's brother lived–and brought out with them a chrome handgun; they said they were ready to commit the Portland robbery. Following instructions from officers to delay the robbery, White informed the two men that he would not drive them across the bridge in broad daylight carrying guns. The two men agreed, returned the guns to the house, and White and Mosley returned to Portland.

On June 12, officers obtained an Ex Parte Order Authorizing the Obtaining of Conversations through the Use of a Body Wire Device.

On June 13, White and Mosley met in Portland. White was wearing a body wire. Officers heard Mosley tell White that he had a Vancouver home he wanted to rob, although he thought there would be people inside that they would have to tie up. He did not want to include Doc. Mosley said he could get guns from his brother in Vancouver. Mosley drew the floor plan of the Vancouver target, explaining that there was a marijuana grow in the basement, guns in the

master bedroom and cash in the house.  Mosley said he hoped to commit the robbery by the weekend.

Surveillance began on June 15 at about 6:00 pm.  The surveillance team followed Mosley and an African-American man wearing a tan jacket (later determined to be Cedric Jones) driving a blue Jeep Grand Cherokee to the Hung Far Low restaurant in Portland, where it arrived at 7:28 pm.  One officer reported seeing three to four people in the Grand Cherokee, without further description of the occupants.

While the Grand Cherokee was parked outside of the Hung Far Low restaurant, defendant Sergeant Joe Santos drove by and saw a white man standing outside of the Grand Cherokee smoking a cigarette.  In his report, Sergeant Santos stated that this was around 6:00 pm, but his report also indicated that officers were following the Grand Cherokee to Hung Far Low at 6:00 pm.  Detective Doug Halpin stated in his report that he saw a "male white in a 'Hawaiian shirt' in the lot smoking" at 7:28 pm.  Pl. Decl. Ex. 1 at 2.  Sergeant Santos described the white man as wearing a yellow shirt with a dark colored pattern on it, like a Hawaiian-style shirt, with short, dark hair and glasses.  Detective Halpin reported the white man with the "multi-colored" shirt went into Hung Far Low at 8:45 pm.  Id. at 3.  The Grand Cherokee left the restaurant at 9:33 pm "with the other two in it," without further description of the occupants.  Id. at 4.

The Grand Cherokee arrived at Mosley's house at 10:06 pm.  A passenger left immediately in a small van and pulled into a driveway at the 5300 block of SE Knapp Street. The police made a note that Robert Rean was associated with the person in whose name the van was registered and was associated with 5306 SE Knapp Street.

Officers met up with White and placed a body wire on him.  White called Mosley on his cell phone at approximately 10:51 pm and he and Mosley agreed to meet at the Hung Far Low restaurant in Portland.  White arrived at the restaurant in his white Yukon at 11:00 pm.

Surveillance watched Mosley and the African-American male in the tan coat drive from Mosley's house, pick up a guy on foot at the address of "5306?" without listing a cross street, and meet with another car.  Pl. Decl. Ex. 1 at 5.  One officer reported seeing two or three people with Mosley between the cars smoking.  Mosley and at least two other people arrived at Hung Far Low in the Grand Cherokee at 11:31 pm.  The passenger got into the driver's seat.  The officers provided no description of the people who arrived with Mosley at the Hung Far Low or of the passenger who got into the driver's seat.  Mosley went into the restaurant to meet White.

The officer listening to the wire heard the conversation only intermittently due to radio static.  The officer heard Mosley say there were "already two whistles underneath the hood of the Jeep."  Jarmer Decl. Ex. L at 3.

White later informed police, after they had arrested Mosley but before they had arrested Rean, that during his meeting with Mosley in the restaurant, Mosley told him he brought three guys to help.  Mosley told him that "the white guy" and two others were going to help them commit the robbery.  Jarmer Decl. Ex. L at 4.  Mosley said there were two guns hidden under the hood of the Grand Cherokee and they would travel to Vancouver to get a third gun.  Mosley told White that he, White and "the white guy" would go into the Vancouver target, and the other two men, who were African-American (Epprell Hayes and Cedric Jones), would handle a person who lived in a trailer on the property.  White could only describe one of the people he saw in the Grand Cherokee; he saw an African-American man wearing a caramel colored coat (later

Page 6 - OPINION AND ORDER

identified as Jones) get into the passenger side of the Grand Cherokee. He could see there were two other people in the car, but he could not describe them due to the vehicle's tinted windows.

Mosley and White left Hung Far Low in the Yukon. The other men traveled in the Grand Cherokee close behind the Yukon. Both vehicles stopped at a Safeway in Portland to buy duct tape and plastic bags, but the Safeway was closed. Both vehicles traveled toward I-205. Police officers executed a traffic stop and pulled the Yukon over and arrested Mosley at 11:58 pm. The Grand Cherokee drove southbound, but was followed by surveillance. Hayes, who later admitted to being the driver, parallel parked the Grand Cherokee near NE 87th Avenue and NE Oregon Street and the occupants exited it.

Defendant Sergeant Santos was charged with following the Grand Cherokee. He was driving an unmarked van. He saw the Grand Cherokee parallel park on NE 87th Avenue, but did not see the occupants leave the vehicle. At the intersection of NE 90th and NE Oregon Street, Sergeant Santos saw a white male wearing a brown leather jacket. The white male turned and looked toward Sergeant Santos' van and Sergeant Santos saw the man had short dark hair, was wearing glasses and the yellow Hawaiian-style shirt. He "immediately recognized this white male as the same white male standing outside of [the Grand Cherokee] at the Hung Far Low about 1800 hours." Santos Aff. Ex. 1 at 2. The white male disappeared in the blocks.

When backup police arrived, they quickly found and arrested Jones.

Defendant Officer Shawn Gore arrived with his canine partner, Eddie. Eddie tracked down Rean talking on his cell phone and "hiding behind a car parked in front of 9019 NE Irving." Gore Aff. Ex. 1 at 3. Defendant Officer Peter Taylor held Rean at gunpoint with an AR-15 until Rean complied and was arrested. Sergeant Santos reported that when he learned Rean

had been taken into custody, he "realized the white male I saw at the Hung Far Low and at NE 90th and NE Irving was in fact Robert Rean.  I know Rean from prior police investigations but haven't seen him for at least two years."  Santos Aff. Ex. 1 at 3.

Eddie also tracked down Hayes and the police arrested him as well.  Police interviewed Hayes who said he received a call from Rean between 10:15 and 10:45 pm that night.  He said he and Rean had been friends for years and were both Hoover Crips.  He said Rean and the others picked him up that night at Hayes' friend's house in the Grand Cherokee.  Rean and Hayes were sitting in the back.  A "small black guy" was in the front passenger seat and Mosley was driving.  Jarmer Decl. Ex. L at 7.  Rean introduced the two guys in the front as his buddies.  He said they drove to Hung Far Low.  When Mosley got out, Hayes got into the driver's seat of the Grand Cherokee.  They then drove to Safeway to get a drink.  Hayes denied knowing anything about the robbery or the guns and said he was just riding in the car with them.

When police interviewed Mosley he said he did not know who the white guy was who was with them that night.

Rean was charged with Robbery 1, Robbery 2, and Kidnapping 1.  On June 16, Multnomah County Circuit Court Judge Susan Svetkey concluded probable cause did not exist for these charges, but that probable cause did exist for Attempted Kidnapping 1, Conspiracy to Commit Robbery 1, and Conspiracy to Commit Robbery 2.  She relied on the affidavit prepared by Portland Police Detective Mitch Hergert.  Rean was charged in state court with Criminal Conspiracy to Commit Robbery 1 and 2 and he entered a plea of "not guilty" at his arraignment on June 18.  On June 25, the information was dismissed for the reported reason, "State cannot proceed[.]"  Green Decl. Ex. I.

On June 28, Green submitted a request for a suspend and detain warrant to keep Rean incarcerated.  Green reported,

> Mr. Rean was arrested by Portland Police on 6/16/07 after he was observed associating with Cedrick Jones[,] a known gang member. When Police stopped the car the two individuals were riding in[,] two guns were found under the hood of the car taped to the car battery.  At this time local charges have been dropped against Mr Rean and the case is under consideration for federal prosecution. The suspend and detain is needed to allow the hearings officer adequate time to give a fair and just hearing.

Green Decl. Ex. J.  In submitting this request to the Oregon Board of Parole and Post Prison Supervision (hereinafter, "the Board"), Green relied on Hergert's affidavit because the police reports were not available to him.

Green then charged Rean, on July 10, 2007, with violating the terms of his post-prison supervision.  Defendant Hearings Officer Jerri Jarmer gave Rean a notice of his rights on July 17. A federal grand jury indicted Rean, and the other three men arrested with him, on July 31.  The indictment charged Rean with Conspiracy, a Hobbs Act robbery and two counts of Felon in Possession of a Firearm.

The Board deferred Rean's revocation hearing for 90 days to avoid interfering with the federal prosecution and set it for September 12.  The board continued the hearing to September 19 because Rean was arraigned on the federal charges on the originally scheduled date. Jarmer issued his decision on September 25, concluding that Rean failed to obey all laws and had associated with known gang members, in violation of his post-prison supervision terms.  Jarmer recommended that Rean's supervision be revoked and that Rean serve 90 days in jail.  The Board accepted this recommendation and, on October 11, revoked Rean's supervision and imposed a

sentence of 90 days in jail.

Rean petitioned for administrative review, appealing the Board's decision, on November 16, 2007.  On June 16, 2008, the Board rejected Rean's challenge and upheld the revocation order.  Rean appealed that decision to the Oregon Court of Appeals on October 19.  Rean subsequently moved to dismiss his appeal, and the Court of Appeals entered judgment for the Board on November 4, 2008.

In the meantime, Rean pleaded guilty to a Superseding Information charging him with federal firearms charges unrelated to the events alleged in the original indictment.  The United States Attorney's Office dismissed the underlying federal indictment and agreed to recommend to the Multnomah County District Attorney's Office that no related state charges be filed.  Judge Mosman accepted the plea agreement and sentenced Rean to 68 months in federal prison on May 27, 2008.  Rean is currently incarcerated at the United States Penitentiary–Victorville in Adelanto, California.

Neither Multnomah County nor its agencies have any record of receiving a tort claim notice from Rean for the acts alleged in his Amended Complaint.

Rean submitted a "Declaration Under Penalty of Perjury" testifying that he was not fleeing from police and he was not a "recent passenger" of a 2004 Jeep Cherokee when he was walking on NE Oregon Street around midnight.  Pl. Decl. ¶ 3.  He noticed he was being followed by a minivan and he became concerned that it contained gang members.  He called his mother and asked her to pick him up.  He was then "accosted" by Officers Gore and Taylor.  Id.  He says he was standing in a well-lit area in front of a parked van and could easily be seen from the street.  The officers threatened him.  He then testifies,

I had not seen or been seen by any of the members of the surveillance team cited in Portland Police report no. 07-46143 because I was not in any of those places at any of those times up until I was seen by Defendant Santos walking eastbound on Oregon Street.

Id. ¶ 9.

II.    Rean's Allegations

Rean alleges that Sergeant Santos, and Officers Gore and Taylor violated his Fourth Amendment and Eighth Amendment rights when they arrested him "not having committed any crime[.]" Am. Compl. ¶ 20.  Rean specifically alleges Sergeant Santos reported seeing him at the Hung Far Low restaurant when other officers make no mention of Sergeant Santos being present. Additionally, Sergeant Santos saw Rean an hour and a half before the other officers reported seeing someone matching Rean's description.  He also contends that Officers Gore and Taylor pointed guns at his head, threatened him, and terrorized him with the canine.  Rean alleges he was held in a cell with no running water or a restroom and was subjected to sleep deprivation, in violation of the Eighth Amendment.  Rean alleges he requested an attorney, which was ignored, in violation of the Sixth Amendment.  Rean alleges he was falsely charged with robbery and kidnapping in violation of the Fourth and Fourteenth Amendment.

Rean alleges the charges were dismissed on June 26, 2007, and he was ordered released. He claims he was not released due to the post-prison supervision violations lodged against him. Rean contacted his probation officer, Green, who told Rean that he was holding Rean until he received the police reports.  Rean alleges the subsequent suspend and detain warrant Green submitted violated his Fourth, Fifth and Fourteenth Amendment rights because it was not supported by probable cause for violating any of the terms of his post-prison supervision.

Page 11 - OPINION AND ORDER

Rean alleges that when he spoke with Green, Green told him that Green had the police reports which indicated Rean was involved in a conspiracy to commit a robbery, but at Rean's violation hearing, Green admitted he never had the police reports. Instead, Green relied on a police memorandum summarizing the allegations. Green reported he subsequently shredded the memorandum. Rean alleges the police reports and Green's violation report are "in stark contrast to one another." Am. Compl. ¶ 32. Rean alleges that the detainer was lodged without probable cause and that Green acted in a conspiracy with police officers to deprive him of his Fourth, Fifth and Fourteenth Amendment rights.

Rean alleges Jarmer gave him an inadequate notice of his rights for the violation hearing and that she made the determination to hold him until the formal hearing without having the police reports. Rean alleges Jarmer and Green held him without probable cause. Additionally, on August 7, 2007, Jarmer provided Rean with a copy of the federal indictment that had been issued on August 1 and told him she was postponing his hearing date for 90 days so as not to interfere with an "ongoing investigation." Am. Compl. ¶ 34. When Rean called the federal court, he was told he would not be arraigned on the federal indictment until the supervision violation was resolved. Rean alleges Jarmer, Multnomah County and the Portland police conspired to violate his rights under 42 U.S.C. §§ 1981, 1983, and 1985.

Rean alleges the Portland police conspired with the United States Attorney's Office to bring false charges against him to obtain an indictment in federal court, in violation of 42 U.S.C. §§ 1983 and 1985. He also alleges that Multnomah County, the Portland police and the Bureau of Alcohol, Tobacco, and Firearms[4] conspired to deprive him of his Fourth, Fifth, Sixth, Eighth

---

[4]Not named as a defendant.

and Fourteenth Amendment rights by falsely arresting him without probable cause and abusing

the post-prison supervision violation process to deprive him of due process.

Rean alleges the City and County failed to properly hire, train and control their agents,

officers and employees.  He also alleges the defendants' conduct constituted "gross negligence."

Am. Compl. ¶ 43.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact

and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The

initial burden is on the moving party to point out the absence of any genuine issue of material

fact.  Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate

through the production of probative evidence that there remains an issue of fact to be tried.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the

evidence is viewed in the light most favorable to the nonmoving party.  Universal Health

Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION

I.    Rean's Motions to Strike

Plaintiff moves to strike the affidavits of the officers and their attorney.  He argues the

officers and their attorney have no personal knowledge as to the events about which they testify,

the affidavits contain statements that conflict with plaintiff's own affidavit and with the

statements made by other officers, the statements are not supported by the evidence, and he has

not had the opportunity to conduct discovery.

Under Federal Rule of Civil Procedure 56(e), affidavits must be based on personal knowledge. All of these officers were involved in investigating or arresting Rean and, therefore, have personal knowledge of the events described in their affidavits. Furthermore, the officers' affidavits are supported by their attached reports. Accordingly, they comply with Rule 56(e)'s requirement that affidavits contain facts that would be admissible in evidence, show that the affiant is competent to testify to the matters stated in the affidavit, and that the affiant has personal knowledge about the events described.

Any statements the officers make that conflict with statements other officers make goes to the eventual weight of the evidence for any jury and is not a basis to strike their affidavits. Similarly, any conflict between the officers' affidavits and plaintiff's declaration is not a basis to strike the officers' affidavits.

The officers' attorney's affidavit is submitted simply to provide self-authenticating exhibits to the court. Rean does not contend these exhibits are false.

As for Rean's assertion that the affidavits should be stricken because he has not obtained the discovery that is the subject of the affidavit, I stayed discovery pending resolution of this motion. As I set forth below, further discovery is unnecessary.

II.    <u>City Defendants' Motion</u>

    A.    <u>Section 1983 Claims</u>

The crux of Rean's complaint against the City defendants is that they arrested him without probable cause in violation of the Fourth Amendment and used excessive force in effectuating the arrest. He also alleges he was detained in constitutionally-deficient conditions and was denied counsel. To state a claim under § 1983, Rean must allege: (1) the action

occurred under color of state law; and (2) the action resulted in the deprivation of a constitutional

right or federal statutory right.  Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).

        1.     Probable Cause to Arrest

Rean alleges the City defendants arrested him without probable cause.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.

A warrantless arrest is reasonable under the Fourth Amendment when there is probable cause to

believe that a criminal offense has been or is being committed.  Devenpeck v. Alford, 543 U.S.

146, 152 (2004).  Whether probable cause exists depends upon the reasonable conclusion to be

drawn from the facts known to the arresting officer at the time of the arrest.  Id. (citing Maryland

v. Pringle, 540 U.S. 366, 371 (2003)).  The court must look to "the totality of the circumstances

known to the arresting officer, to determine if a prudent person would have concluded there was

a fair probability that the defendant had committed a crime."  John v. City of El Monte, 515 F.3d

936, 940 (9th Cir. 2008) (internal brackets omitted).  Although evaluating probable cause is a

highly fact dependent issue, "whether a reasonable officer could have believed probable cause

. . . existed to justify . . . an arrest is 'an essentially legal question' that should be determined by

the district court at the earliest possible point in the litigation."  Peng v. Mei Chin Penghu, 335

F.3d 970, 979 (9th Cir. 2003).  "Thus, where the material, historical facts are not in dispute, and

the only disputes involve what inferences properly may be drawn from those historical facts, it is

appropriate for this court to decide whether probable cause existed . . . ."  Id. at 979-80.

Additionally, "[p]robable cause is an objective standard and the officer's subjective

intention in exercising his discretion to arrest is immaterial in judging whether his actions were

Page 15 - OPINION AND ORDER

reasonable for Fourth Amendment purposes." John, 515 F.3d at 940; Devenpeck, 543 U.S. at 153 (cases make clear that arresting officer's state of mind is irrelevant, except for the facts that he knows; question is whether circumstances viewed objectively justify the action). The court makes this determination "based upon the information the officer had at the time of making the arrest." John, 515 F.3d at 940.

Finally, the "arresting officer need not have personal knowledge of the facts sufficient to constitute probable cause. Probable cause may be based on the collective knowledge of all of the officers involved in the investigation and all of the reasonable inferences that may be drawn therefrom." United States v. Hoyos, 892 F.2d 1387, 1392 (9th Cir. 1989) (internal citations omitted), overruled on other grounds by United States v. Ruiz, 257 F.3d 1030 (9th Cir. 2001).

The City defendants argue they had probable cause to arrest Rean. I agree. Taking the facts in the light most favorable to Rean and resolving inferences in his favor, I conclude the officers had probable cause to arrest him. At the time they arrested Rean, the officers knew that Mosley and White had discussed a home invasion in Vancouver. They observed that Rean knew Mosley since they saw the two of them together at the Hung Far Low restaurant around either 6:00 pm or 7:30 pm, depending on which officers' report I rely on. They knew Mosley picked somebody up on his way to the Hung Far Low, possibly at the address associated with Rean.

Regardless of whether any officer observed Mosley picking Rean up, the officers knew Mosley and at least two other people arrived at the Hung Far Low to meet White around 11:30 pm. Before officers arrested Rean, White informed an officer that Mosley told him at the Hung Far Low restaurant that the "white guy" was going to help with the robbery. Rean was the only "white guy" spotted in the group. White also told the officer that there were three people in the

Page 16 - OPINION AND ORDER

Grand Cherokee.  Finally, officers arrested Rean only two and a half blocks from where Hayes had parked the Grand Cherokee.

Rean argues he never met White, that no police officer heard Rean mentioned on the body wire, and that no police officer can say Rean was a passenger in the Grand Cherokee.  What Rean argues is correct.  Nevertheless, Rean's involvement need not be conclusively established.  There need only be sufficient evidence from which a prudent person would have concluded there was a fair probability that the defendant had committed a crime.  John, 515 F.3d at 940.  Based on what they knew, officers had probable cause to believe Rean had committed the crimes of Attempted Kidnapping 1, Conspiracy to Commit Robbery 1, and Conspiracy to Commit Robbery 2. Although Rean was not initially charged with committing these offenses, the arrest is not unconstitutional if officers had probable cause to believe the suspect has committed some crime. Devenpeck, 543 U.S. at 153 (officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause").

I have considered Rean's declaration in which he contends he played no part in the attempted robbery plot.  See Jones v. Blanas, 393 F.3d 918, 922-23 (9th Cir. 2004) (court must consider "plaintiff's contentions offered in motions and pleadings . . . where [offered] under penalty of perjury" and where based on personal knowledge).  Rean fails to raise a genuine issue of fact, however, because the focus of the inquiry is on the facts known to the officer at the time of the arrest.  John, 515 F.3d at 940.  As I have set forth above, viewing the totality of the circumstances, the officers had probable cause to arrest Rean for Attempted Kidnapping 1, Conspiracy to Commit Robbery 1, and Conspiracy to Commit Robbery 2.  Under the totality of

the circumstances, a "prudent person would have believed that defendants had probable cause" to arrest Rean.  See Hoyos, 892 F.2d at 1393.

        2.     Excessive Force

Rean alleges Officers Gore and Taylor pointed guns at his head, threatened him and terrorized him with a canine.  "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  Blanford v. Sacramento County, 406 F.3d 1110, 1115 (9th Cir. 2005) (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).  Under this balancing test, the court considers, among other factors, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Id.  The reasonableness of the use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Id.

I agree with Rean that, looking at the facts in the light most favorable to Rean, he was not fleeing.  Unmarked police vehicles followed the Grand Cherokee; the driver was not knowingly leading police on a chase.  In fact, Hayes parallel parked the Grand Cherokee.  More importantly, when Sergeant Santos, who was driving an unmarked van, saw Rean he reported he saw Rean "walking quickly," not running.  Santos Aff. Ex. 1 at 2.  Accordingly, there is no evidence Rean was "actively resisting arrest or attempting to evade arrest by flight."  Blanford, 406 F.3d at 1115. As far as Rean knew the Yukon was pulled over in a traffic stop.  In sum, Rean and the other

occupants had no interaction with the police that would cause a factfinder to conclude they were evading arrest.

Additionally, the City defendants contend Rean was known to have gang connections and known to resist arrest.  None of the police officers have offered any evidence that they knew Rean had resisted arrest in the past and there is no such statement in any of the police reports.  It is conceivable that the officers checked Rean's criminal history prior to looking for him, but there is no evidence they did.  Sergeant Santos included in his report, and reiterates in his affidavit, that he knew Rean from prior police investigations, but he gives no further details.  Officer Gore did, however, testify that he knew "guns were involved with the suspects for a potential armed robbery, that Rean was possibly armed, and that Rean was affiliated with a gang."  Gore Aff. ¶ 9.  He does not indicate how he knew that.

Nevertheless, the circumstances here justified the very low level of force used by the officers and I conclude that the amount of force the police officers used was "'objectively reasonable' in light of the facts and circumstances confronting the officer."  Robinson v. Solano County, 278 F.3d 1007, 1013 (9th Cir. 2002) (en banc) (quoting Graham, 490 U.S. at 397)).  First, Rean was not injured in any fashion.  The canine made no contact with Rean and the officers did not shoot at him or injure him in any fashion.  See Miller v. Clark Co., 340 F.3d 959, 964 (9th Cir. 2003) (court to consider type and amount of force).

Second, the officers were investigating a serious crime of armed robbery and kidnapping involving multiple suspects.  The officers knew the suspects had at least two guns; they heard on the body wire Mosley say there were "two whistles" under the hood, and they confirmed with White, prior to Rean's arrest, that Mosley had said there were two guns under the hood of the

Grand Cherokee.  Rean argues that officers had found the guns by the time they began tracking

him.  This may be true, but from the perspective of a reasonable officer, the fact that the suspects

were in possession of two guns might mean they were in possession of other weapons.

Additionally, it was midnight and dark outside.  Although Rean contends he was arrested

under a streetlight, officers were tracking him in the dark and he could have been hiding

anywhere.  Rean also contends he was not crouching or hiding from the police.  Accepting his

statement over the police reports in this summary judgment procedure, given the facts set forth

above, I conclude the officers used appropriate force in approaching Rean with their guns drawn

and with the leashed canine.  Rean posed a serious risk to officers and the results of the balancing

test weigh in favor of the officers.

3.    Failure to Hire, Control, Train

As an initial matter, the Portland Police Bureau is an improperly named defendant.

Typically, the municipality itself is sued and not the police department.  See Hervey v. Estes, 65

F.3d 784, 791 (9th Cir. 1995) (defendant, a conglomerate of police bureaus, was not "person"

since it was not municipality or other separate legal entity).  The City of Portland is the proper

entity that may be responsible for any constitutional violations.  All § 1983 claims are dismissed

against the Portland Police Bureau.

Although a municipality may not be liable on a *respondeat superior* theory, a plaintiff

may make a case for local governmental liability by establishing that: (1) a governmental

employee committed the alleged constitutional violation pursuant to a formal governmental

policy or a "longstanding practice or custom which constitutes the 'standard operating procedure'

of the local governmental entity;" (2) the individual who committed the constitutional tort was an

official with "'final policy-making authority' and that the challenged action itself thus constituted

an act of official governmental policy;" or (3) "an official with final policy-making authority

ratified a subordinate's unconstitutional decision or action and the basis for it." Gillette v.

Delmore, 979 F.2d 1342, 1346-47 (9th Cir. 1992) (per curiam) (internal citations omitted).

As I have set forth above, Rean fails to establish he suffered a constitutional violation at

the hands of the City defendants.  Furthermore, he fails to point to an unconstitutional practice or

policy.  As a result, this claim must be dismissed.

4.    Conditions of Confinement

Rean alleges he was handcuffed and held at the Northeast Precinct for several hours in a

cold, concrete cell without running water or a toilet.  He alleges he was unable to sleep because

"the hours that he was held were his normal sleeping hours."  Am. Compl. ¶ 22.  He claims he

lost his feeling in both arms and legs "presumably due to a lack of proper circulation of his

blood" due to the handcuffs.  Id. at ¶ 23.

Plaintiff's rights derive from the Due Process Clause rather than the Eighth Amendment

because he was a pretrial detainee at the time of the alleged violations.  Bell v. Wolfish, 441 U.S.

520, 535 (1979).  Nevertheless, courts apply the same standards in reviewing prisoners' and

pretrial detainees' rights.  Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).  An Eighth

Amendment claim for denial of humane conditions must satisfy both an objective and subjective

inquiry.  Lopez v. Smith, 203 F.3d 1122, 1132-33 (9th Cir. 2000).  The objective element of the

Eighth Amendment inquiry seeks to determine whether the deprivation was sufficiently serious.

Wilson v. Seiter, 501 U.S. 294, 298 (1991).

Keeping Rean handcuffed during his detention did not violate the Constitution.  Rean was charged with having committed serious crimes and the conditions of his confinement were justified by legitimate safety concerns.  With regard to the cold cell without running water or a toilet and bright lights, "[t]he Constitution 'does not mandate comfortable prisons.'"  Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Rhodes v. Chapman, 452 U.S. 337, 349 (1981)).  I also consider the amount of time Rean was subject to these conditions, which was only a few hours according to his allegations.  See Hutto v. Finney, 437 U.S. 678, 686-87 (1978) (length of isolation sentences considered as factor).  Rean identifies no hardship he suffered that could be characterized as sufficiently serious to rise to the level of a constitutional violation.

This claim is dismissed.

5.    Denial of an Attorney

Rean alleges he asked why he was being held and he requested an attorney several times during the time he was held by the City defendants.  He claims he was ignored.

Rean does not allege he was questioned or interrogated in any way, so his Fifth Amendment right to counsel was not triggered while he was in the custody of the City defendants.  Miranda v. Arizona, 384 U.S. 436, 474 (1966).  Rean's Sixth Amendment right to counsel was not triggered until the "initiation of formal charges."  Moran v. Burbine, 475 U.S. 412, 431 (1986).  Rean fails to state a claim for deprivation of counsel and this claim is dismissed.

B.    Claims Under 42 U.S.C. §§ 1981 and 1985

Rean's claims pursuant to 42 U.S.C. § 1981[5] and 42 U.S.C. § 1985[6] must be dismissed.

In order to make out a claim under § 1981, Rean must plead facts showing: (1) he is a member of a racial minority; (2) defendants intentionally discriminated against Rean on the basis of his race; and (3) the discrimination concerned the making or enforcement of a contract, including all phases and incidents of the contractual relationship.  Allen v. U.S. Bancorp, 264 F. Supp. 2d 945, 948 (D. Or. 2003).  Rean is not a member of a racial minority and does not allege facts from which I can conclude he is raising an issue of intentional race discrimination.  Neither Rean's Amended Complaint nor his briefing sufficiently set forth facts raising a reasonable inference of defendants' intent to discriminate against him on the basis of his race.

To state a cause of action under § 1985, a plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of this conspiracy; (4) whereby a person is either injured in his

---

[5] "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ."  42 U.S.C. § 1981(a).

[6] "If two or more persons in any State or Territory conspire . . . , for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."  42 U.S.C. § 1985(3).

person or property or deprived of any right or privilege of a citizen of the United States. <u>United Broth. of Carpenters and Joiners of America v. Scott</u>, 463 U.S. 825, 828-29 (1983). The second of these four elements requires that a plaintiff allege defendants were motived by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." <u>Griffin v. Breckenridge</u>, 403 U.S. 88, 102 (1971).

Rean seeks damages from an alleged conspiracy between the City and County defendants, in violation of 42 U.S.C. § 1985. However, Rean does not allege defendants were motivated to act by Rean's race or carried some other discriminatory animus toward Rean. He argues that he is a member of a class of convicted felons or members of a gang, but these are not classes recognized by the government as "requir[ing] and warrant[ing] special federal assistance in protecting their civil rights." <u>Sever v. Alaska Pulp Corp.</u>, 978 F.2d 1529, 1536 (9th Cir. 1992).

In sum, Rean has not and cannot allege facts sufficient to survive summary judgment on his claims under §§ 1981 and 1985.

C.    <u>State Claims</u>

Rean provided a tort claim notice for a false arrest claim only. Rean's gross negligence claim must be dismissed pursuant to ORS 30.275 since he failed to notify the City defendants of this claim. Such a notice is due within 180 days of the alleged loss or injury. ORS 30.275(1)-(2)(b). Rean was arrested on June 16, 2007; accordingly, Rean failed to provide a tort claims notice within the requisite time and is now past the deadline.

Rean's false arrest claim fails for the same reason his federal claim fails; as set forth in detail above, the officers had probable cause to arrest him. <u>See</u> <u>Bacon v. City of Tigard</u>, 81 Or.

App. 147, 724 P.2d 885 (1986) (probable cause is a complete defense to a false imprisonment allegation).

Rean's state claims against the City defendants are dismissed.

III.    County's Motion

A.    Heck v. Humphrey Bar

Defendant Jarmer recommended that plaintiff's supervision be revoked and that he be sentenced to 90 days in jail.  The Parole Board accepted that recommendation.  Rean challenged that decision in the administrative review process.  He made the arguments then, as he does now, that Jarmer did not give him notice of his rights and that there was insufficient evidence of a violation of law.  The Board reviewed Rean's challenge and rejected it.  Rean appealed that decision, through his criminal defense attorney, but dismissed his petition stating he "no longer desires to proceed."  Jarmer Decl. Ex. U.

Heck v. Humphrey, 512 U.S. 477, 487 (1994) stands for the proposition that a § 1983 plaintiff must prove that the conviction or sentence has been invalidated in order to recover damages because to allow otherwise "would necessarily imply the invalidity of his conviction or sentence[.]"  Faced with claims similar to those Rean raises here, the Ninth Circuit has dismissed claims for wrongful arrest, malicious prosecution and conspiracy to bring false charges if the plaintiff is unable to show the conviction was reversed.  See Guerrero v. Gates, 442 F.3d 697, 703 (9th Cir. 2006) (wrongful arrest, malicious prosecution, and conspiracy barred by Heck); Smithart v. Towery, 79 F.3d 951, 952 (9th Cir. 1996) (allegation of arrest without probable cause and malicious prosecution barred by Heck).

Rean's challenge to the procedures used by Jarmer (specifically, her failure to give him notice of his rights), his allegations of conspiracy between the City and County defendants, his assertions of wrongdoing by Green, and his questioning of the basis for the revocation are barred by <u>Heck v. Humphrey</u>. Any decision from this Court on Rean's challenge would necessarily imply the invalidity of the post-prison supervision revocation. His § 1983 claims against the County and defendants Jarmer and Green are dismissed.

B.    <u>Sections 1981 and 1985</u>

Rean's claims against the County defendants for violations of §§ 1981 and 1985 fail for the same reasons as they do against the City defendants. Rean's claims are dismissed.

C.    <u>State Claims</u>

Rean appears to allege claims against the County defendants for gross negligence, for false arrest and false imprisonment. All state claims against the County defendants must be dismissed pursuant to ORS 30.275. Rean never served a tort claims notice on any of the County defendants. Such a notice is due within 180 days of the alleged loss or injury. ORS 30.275(1)-(2)(b). Rean's post-prison supervision was revoked on October 11, 2007; accordingly, Rean failed to provide a tort claims notice within the requisite time and is now past the deadline. His claims are dismissed.

D.    <u>Remaining Arguments</u>

Since I find that the County defendants are entitled to summary judgment on all of Rean's claims, I do not reach their alternative argument that Jarmer and Green are entitled to immunity or that Rean's § 1983 claim fails on its merits.

E.      Rean's Rule 56(f) Motion

Rean's claims against the County fail as a matter of law.  As a result, he is not entitled to undertake discovery and his motion is denied.

IV.     Conclusion

Rean has failed to raise a material issue of fact sufficient to survive summary judgment. As a result, his complaint is dismissed with prejudice.

**CONCLUSION**

The City defendants' Motion for Summary Judgment (#25) is  granted. The County defendants' Motion for Summary Judgment (#33) is granted.  Rean's motions to strike the affidavits submitted in support of the City's motion (## 48, 49, 50, 51, and 52) are denied. Rean's Motion for Extension of Time to File a Response/Reply to Motion for Summary Judgment (# 59) is denied.

IT IS SO ORDERED.

Dated this _____15th_____ day of December, 2009.


  /s/ Garr M. King_____
Garr M. King
United States District Judge